**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**STEVEN BILODEAU, JR.,**
**SUSAN HUDSPETH,**
**BRIAN MITCHELL,**
**RAYMOND SMITH, and**
**WILTON WAHLKAMP,**
***on behalf of themselves and others***
***similarly situated,***

**Plaintiffs,**

**v.** **Civil Action No. 2:25-cv-686**

**TRANS UNION, LLC,** **JURY TRIAL DEMANDED**

**Defendant.**

## CLASS ACTION COMPLAINT

COME NOW the Plaintiffs Steven Bilodeau, Jr., Susan Hudspeth, Brian Mitchell, Raymond Smith, and Wilton Wahlkamp (collectively, the "Plaintiffs"), *individually and on behalf of others similarly situated,* by Counsel, hereby file their Class Action Complaint against Defendant Trans Union LLC ("Defendant" or "Trans Union").

## PRELIMINARY STATEMENT

1. In this Court and Circuit, "CRAs [Consumer reporting agencies] cannot just report verbatim whatever is provided them by their sources; they must have procedures in place to ensure that the information from those sources is accurate." National Consumer Law Center, FAIR CREDIT REPORTING (10th ed. 2022), updated at www.nclc.org/library, §4.4.6.4.1 *CRAs must have procedures to monitor and oversee furnishers*.

2. Here, Defendant, a Big-3 CRA blindly accepted the reporting of loans fraudulently created by now bankrupt Power Home Solar, LLC d/b/a Pink Energy ("Pink Energy") and the

closely connected financial institutions that were used as the "furnishers" of credit reporting information verbatim rereported by Trans Union in the credit reports of the Plaintiffs and many other consumers like them.

3. The loans were created as a way to sell – usually door-to-door or by phone – supposed solar panel systems. The systems were not genuine and are now the subject of a bankruptcy filed on October 7, 2022, in the Western District of North Carolina. The loans as well were grossly inflated and not such as to conform with ordinary consumer credit instruments more typically reported through Trans Union.

4. Additionally, the loans that were created to finance these solar sales were themselves fraudulent and void. For example, they each falsely stated the amount financed or principal and the interest owed and paid, usually in experienced significant stress, credit and reputational harm as a result. percentages. The loans also falsely described their purpose and type.

5. The tradelines reported for these loans were patently inaccurate as they uniformly and materially misstated the actual relationship between the consumer and the lender and they overstated the principal amount of each loan and in many instances inaccurately reported the type and nature of the loan. (The "Inaccuracies.")

6. Numerous Attorneys General – including Virginia's own - sent letters to Pink Solar's financial institution partners demanding that those creditors and financial institution partners who work with Pink Energy as its financing side, including Sunlight Financial LLC ("Sunlight"), Dividend Solar Finance LLC, ("Dividend"), GoodLeap, LLC, ("GoodLeap"), and Solar Mosaic, Inc. (collectively, the "Pink Energy Partners"), cease asserting those victimized consumers' fraudulent payment obligations.

7. On March 7, 2024, the Minnesota Attorney General filed an enforcement action,

*State v. GoodLeap LLC*, No. 27-CV-24-3558 (Minn. Dist. Ct. Hennepin Cnty. March 7, 2024), that outlined the full lending scam and how all of the Pink Energy Partners created residential solar power loans that unlawfully and objectively misrepresented the loans because of the Inaccuracies.

8. For avoidance of doubt, Plaintiffs seek relief against Trans Union in this case only for conduct occurring on and after March 8, 2024, the day after the Minnesota Attorney General's March 7, 2024 filing that placed Trans Union on special notice of these problems. Any pre-March 8, 2024 facts are pled as to background context only.

9. And in 2024, numerous lawsuits across the country in 2023 and 2024 were consolidated in a Multi-District Litigation case in the United States District Court for the District of Minnesota against Dividend.

10. Decisions in both of these cases have now clearly determined that the Pink Energy Partner loans for residential solar power installations were inaccurate as reported for any loan where the face of the amount of the loan was inflated beyond the amount actually disbursed to the installer. *In re Dividend Solar Fin., LLC*, No. MDL 24-3128 (KMM/DTS), 2025 WL 2430484, (D. Minn. Aug. 22, 2025) (Denying motion to dismiss nationwide Truth In Lending Act and fraud claims based on hidden fee that was a finance charge and could not be disclosed as principal); *State v. GoodLeap LLC*, No. 27-CV-24-3558 (Minn. Dist. Ct. Hennepin Cnty. July 4, 2025) (Same and finding that the facts support a claim for deception against all four Pink Energy Partners for their lending in Minnesota on residential solar power installations).

11. On or after March 8, 2024, despite special notice arising from the Minnesota AG filing, Trans Union continued allowing Goodleap and the other Pink Energy Partners to report these debts on Plaintiffs' and putative class members' credit reports in order to coerce repayment of these Pink Energy based debts.

12. Section 1681e(b) of the FCRA requires consumer reporting agencies to use "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." The § 1681e(b) violations alleged herein are limited to acts and omissions on and after March 8, 2024.

13. Trans Union violated this provision as well as § 1681i(a) which required it to conduct a substantive investigation when it received the Plaintiffs' disputes.

14. This is a class action for statutory, actual, and punitive damages, costs and attorney fees, brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"). Defendant violated § 1681e(b) on a systemic basis by ignoring inconsistent information it received from consumer disputes, Attorneys General correspondence and public statements, and widespread press coverage of the Pink Energy accounts, and deferred instead to contradictory and unverified information reported by automated transmission from its paying subscribers, the Pink Energy partners. Trans Union also violated § 1681e(b) when it failed to delete or permanently block the reporting of the disputed Pink Energy Partner accounts when it knew they were disputed. Plaintiffs also bring their own individual claims for actual, statutory and punitive damages for Trans Union's failure to properly investigate their disputes, as required by 15 U.S.C. § 1681i(a).

**JURISDICTION AND VENUE**

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1681p, and 15 U.S.C. § 1692k(d).

16. Venue is proper in this District and Division because the majority of the named Plaintiffs (Steven Bilodeau, Jr., Raymond Smith, and Wilton Wahlkamp) are residents of this District, many of the violations described in this Complaint occurred in this District, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and Trans Union

transacts business within this District and Division, and at least two named Plaintiffs (Steven Bilodeau, Jr. and Wilton Wahlkamp) reside in the Norfolk/Newport News Division.

## PARTIES

17. Plaintiffs Steven Bilodeau, Jr., Susan Hudspeth, Brian Mitchell, Raymond Smith, and Wilton Wahlkamp are natural persons and "consumer[s]" as defined by § 1681a(c).

18. Defendant Trans Union LLC is a limited liability company headquartered in Illinois and does business in the Commonwealth Virginia through its registered agent.

19. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

### A. The Statutory Background Regarding FCRA Claims.

20. Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA in 1970 to ensure the "confidentiality, accuracy, relevancy, and proper utilization" of credit reports. 15 U.S.C. § 1681(b). This section imposes a high, and often disregarded, standard on consumer reporting agencies. *See, e.g., Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b), and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived.'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993)).

21. To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including § 1681e(b), one of the cornerstone provisions of the FCRA. Whenever a consumer reporting agency prepares a consumer report, § 1681e(b) requires the CRAs like Trans Union to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b).

22. Trans Union is a consumer reporting agency and charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information it reports. Trans Union fell short of that duty here, as it reported adverse, outdated, and inaccurate information related to Plaintiffs' accounts—that should have been deleted from Plaintiffs' credit files as required by the FCRA.

23. The Consumer Financial Protection Bureau has noted, "experience indicates that [consumer reporting agencies] lack incentives and under-invest in accuracy." Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).

24. Statutes like the FCRA therefore provide consumers with the only mechanism by which they can force consumer reporting agencies like Trans Union to report accurate information about them.

**B. Trans Union May Not Blindly Parrot its Source**

25. The FCRA accuracy requirements for consumer reporting agencies, such as Trans Union, are primarily at 15 U.S.C. §§ 1681e(b) and 1681i(a). Judge Trenga has explained the basic relationship and elements of these two sections:

> [C]ourts have found with respect to the initial collection of information that, absent reason to believe information from generally credible sources is inaccurate, a CRA is not required under Section 1681e(b) to go beyond its initial source of information to verify that information. See, e.g., *Henson v. CSC Credit Servs*., 29 F.3d 280,

> 285–86 (7th Cir.1994) …. However, once the accuracy of information is actually challenged by a consumer, the sufficiency of a CRA's conduct relative to its duty of care will be evaluated under a "balancing test" that weighs the cost of verifying the accuracy of the information versus the possible harm of reporting inaccurate information, and this test becomes markedly more favorable to plaintiff's who have disputed the accuracy of the information in their credit reports. *See Johnson*, 357 F.3d at 432–33, citing with approval *Cushman v. Trans Union Corp*., 115 F .3d 220, 225 (3d Cir.1997) (collecting cases and explaining that "[i]n short, when one goes from the § 1681e(b) investigation to the § 1681i(a) reinvestigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly."

*Burke* at *5. In shorter summary, the sections provide that a CRA is entitled to rely on the reporting of a "generally credible source" until the CRA is put on notice that the source or the information reported may be suspect. This analysis is repeated in the leading case law threads, which track from *Henson* and *Cushma*n.

26. However, no furnisher is presumptively credible absent some basis. Even a bank or other financial institution is not deemed credible as a matter of law. Another credit bureau, Experian, litigated this question in another parroting case in which the plaintiff sought in limine to exclude any evidence that the furnisher (Nationstar) was reliable. The trial court granted and denied the motion in part as the parties there had put into the record some evidence of the furnisher's reliability. However, beyond that, the court held: "In this regard, the Court is not persuaded by [Experian]'s argument that there is a 'presumption' in the law that financial institutions are reliable[.]" *Losch v. Experian Info. Sols., Inc*., 2022 WL 17823664, at *8 (M.D. Fla. May 17, 2022).

27. While information supplied by sources a CRA has reason to know are "generally credible" may be presumptively accurate, absent such presumption, the agency must initially investigate and research to ensure that the information the source will later report is maximally accurate. As this Court has explained:

> While neither Section 1681e(b) nor 1681i(a)(1)(A) uses the term "investigation," it is clear from their explicit requirements that the obligation to conduct an investigation or reinvestigation that is reasonable under the circumstances is central to Experian's duty of care under the FRCA. This conclusion flows from the plain meaning of both sections. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." Webster's Third New International Dictionary 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived ..." Id. at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke* at *4.

28. Trans Union does not follow any process or procedures to initially examine, audit, discuss, review or in any other way determine or measure the accuracy of the information any furnisher, including those at issue here, reports.

29. Trans Union never investigates the credibility of its subscriber's reporting before litigation is filed by a consumer.

30. After accepting a subscriber as a customer and source, Trans Union does not follow any process or procedures to thereafter examine, audit, discuss, review or in any other way determine or measure the accuracy of the information any furnisher, including those at issue here, reports.

31. Trans Union does not follow any procedure or process to monitor or review publicly available information about a particular subscriber or reporting source.

32. Further, even if Trans Union had known everything alleged in this Complaint about the subject subscribers, it still would not have changed anything and would still have continued to blindly parrot its paying customer sources.

**C. Allegations Regarding the Class Claims for Violations of § 1681e(b) Post-Minnesota AG Complaint**

33. The class allegations below concern Trans Union's reporting on and after March 8, 2024.

34. Trans Union has allowed the reporting within Plaintiff Bilodeau's credit reports of an account supposedly opened by and owed to: "GoodLeap LLC Partial Acct #200503…."

35. Trans Union has also allowed the reporting within Plaintiff Susan Hudspeth's credit reports of an account supposedly opened by and owed to "GoodLeap LLC" reported as an open date of April 2020.

36. Trans Union has also allowed the reporting within Plaintiff Brian Mitchell's credit reports of an account supposedly opened by and owed to "GoodLeap LLC" reported as an open date of August 2020.

37. Trans Union has also allowed the reporting within Plaintiff Raymond Smith's credit reports of an account supposedly opened by and owed to: "GoodLeap LLC" with an original balance of $60,040.

38. Trans Union has also allowed the reporting within Plaintiff Wilton Wahlkamp's credit reports of an account supposedly opened by and owed to "GoodLeap LLC" reported as an open date of September 8, 2020.

39. In fact, Plaintiffs Bilodeau, Hudspeth, Mitchell, Smith, and Wahlkamp do not have any accounts with or debt owed to this furnisher in the amount claimed, and any account is actually owed to a different entity. "GoodLeap LLC" formerly Loanpal is actually just a fintech platform operated to allow non-bank companies to lend money to consumers without otherwise satisfying the requirements necessary to operate as a state or national bank. It has none of the

indicia or structure of a business such as Bank of America, Wells Fargo or other assumed credible financial institutions.

40. GoodLeap and other Pink Energy Partners have been publicly criticized in ways easily knowable by Trans Union.

41. For example, the FDIC has slapped Cross River Bank with a consent order, accepted and stipulated as true by Cross Rover, because it engaged in unfair and deceptive practices in violation of Section 5 of the Federal Trade Commission (FTC) Act and violated the Federal Consumer Credit Protection Act, 15 U.S.C. § 1600, et seq, statutes, in multiple ways. The order was issued in March 2023. https://orders.fdic.gov/sfc/servlet.shepherd/document/download/0693d000007xEStAAM?operationContext=S1.

42. In fact, Cross River was required by that Consent Order to restrict or cease its allowance of its "Bank" label with non-Bank entities actually originating and handling the product. ("The Bank will not (i) execute a binding commitment or agreement with a New Third Party; (ii) allow a New Third Party to offer a Credit product through, or in conjunction with the Bank; and/or (iii) offer a New CRB Credit Product, either directly or indirectly, without first receiving the Regional Director's written non-objection to do so.")

43. Similarly, "Sunlight Financial" is not a traditional or presumptively credible lender or source of credit reporting.

44. Sunlight Financial filed a reorganization bankruptcy and then emerged.

45. Plaintiffs, and the class they seek to represent, do not have any loan obligation for any Cross River Bank, Sunlight, Technology Credit Union, or GoodLeap arranged transaction in the amount reported. Trans Union's credit reports are thus factually inaccurate for all.

46. Plaintiffs allege for themselves and each class member that the Pink Energy loans are void and illegal. All of the Pink Energy Partners follow the same unlawful method. "Consumers are unaware of Defendants' upfront fees because Defendants do not allow sales companies to identify such fees in sales proposals and do not calculate such fees in advertised APRs or otherwise disclose the fees as finance charges. Instead, Defendants require [] solar companies to hide the fee in the stated price of the financed system." *State v. GoodLeap LLC*, Compl., ¶ 29.

47. Regardless of whether the loans themselves are void, they are patently inaccurately reported. The reporting does not accurately state the status and terms of the Pink Energy loans. In each instance, the loans arranged by the Furnishers inflated the principal and included a finance charge that was not permitted by the form contract. "Simply put, [the Pink Energy Furnishers] deceive consumers by charging a hidden and costly upfront fee that they add into the stated price of each financed system while falsely telling consumers that the inflated price only reflects the system's cost rather than financing." *State v. GoodLeap LLC*, Compl., ¶ 15. For example, in each contract the lender incorporated the Truth in Lending Disclosures into the contract itself. The Amount Financed disclosure is to "[t]he amount of credit provided to you on your behalf." This number shows up as the high balance on all of the reporting on the accounts. This amount was not the amount of credit provided to each of the Plaintiffs. The contract documents make plain that the credit is provided to pay for the installation of a residential solar power system. A simple fact question to the lender is what amount of money was provided to the installer for the solar power system. The answer is that in every instance it was far less than the amount disclosed on the credit contract. The actual high balance was less, and was less by the amount not disbursed to the installer. The balance could only be the amount actually disbursed to the installer.

48. Thus, starting with the wrong initial balance, the reporting is inaccurate because interest was improperly assessed under the objectively knowable text of these form contracts. For example, all Pink Energy Partner arranged loans have an interest section where the creditor promises that interest will be assessed only on the amount paid to the installer, and for all of these contracts the amount paid to Pink Energy was far less than the disclosed Amount Financed. Because the actual Amount Financed was far less than the disclosed Amount Financed, improper interest was charged every month. Thus, the balance reported each month was wrong and each month the amount by which it was wrong increased.

49. Further, some of the contracts were falsely reported as a “Secured Home Improvement Loan,” which in the credit reporting industry means a home improvement loan secured by the consumers’ home.[1] In fact, “Home Improvement Loan” is a defined term of the Home Mortgage Disclosure Act (HMDA) (12 U.S.C. 2801 et seq.). See 12 C.F.R. § 1003.2(i) (2024). Trans Union’s colleague Experian, explains in *How Do Home Improvement Loans Work*?, “You can use either secured or unsecured loans for home improvements. A secured loan, such as a home equity loan, home equity line of credit (HELOC) or cash-out refinance, requires collateral. In these cases, your home serves as collateral for the money you borrow, and the lender may be able to foreclose on your home if you can't repay the money.”

50. The loans for Plaintiffs and each putative class member were materially different than the tradelines reported to Trans Union and republished. The fraudulent loans and Trans Union

---

[1] If it was actually a loan secured by the residence, the Truth in Lending Disclosure would have to state so and, in such instances, provide the TILA disclosures about the right to cancel and also not contain any arbitration clause. Therefore, reporting a loan secured by personal property as a loan secured by a home was inaccurate.

credit reporting materially inaccurately reported the principal amounts owing on these loans. Such reporting was in each instance substantially greater than the principal actually owing on the loans.

51. None of the loans involving Plaintiffs reported to Trans Union by the Pink Energy Partners were in fact "Secured Home Improvement Loans." That term is intended by the industry-governing Credit Reporting Resource Guide and by common meaning within the trade and credit industry to mean that the loan is secured by real property. These supposed loans were never secured by real property.

52. This distinction is material as a reported mortgage lien on a consumer's real property conveys to third parties that the consumer does not have the means to obtain a real property mortgage and that their home is already encumbered.

53. These facts were readily apparent to Trans Union had it even investigated its furnisher-sources before agreeing to accept and blindly report factually inaccurate information about them.

54. The loans at issue in this case arise from a scheme designed by a now defunct and bankrupt company, Pink Energy, with GoodLeap and the other Pink Energy Partners to use deceptive sales practices to defraud thousands of consumers into signing scam loans to pay tens of thousands of dollars each in connection with their supposed purchase of functional rooftop solar systems, while much of the money supposedly "financed" was itself just unearned financial charges and similar fees, kickback commissions to Pink Energy and other facially suspect and fraudulent components.

55. After many lawsuits were filed against Pink Energy, including by at least one Attorney General, and when it was under investigation of many more Attorneys General, it declared bankruptcy.

56. In the interim, thousands of consumers like Plaintiffs have become the financial victims of Pink Energy's unlawful and deceptive sales practices as well as the unlawful scam financial structures and fees within these loans, now being on the hook for tens of thousands of dollars in loans for a sham product.

57. The problem though was not that the Plaintiffs and similar consumers purchased defective products, but rather that they were victimized by a connected scheme between the financial institution partners and Pink Energy to attempt to separate the fraud from the loan instruments, with these Pink Energy financial institution partners conspiring and working with Pink Energy to inflate the loans, mislead consumers as to the actual "price" (known by everyone but the consumer to be false) and to circumvent federal and state consumer lending protections.

58. When they discovered the interconnections between the financial institution partners and Pink Energy, the Virginia Attorney General and other Attorneys General notified each of these parties that the Pink Energy loans should be suspended and should not be lawfully enforced.

59. The letter from the state Attorneys General Plaintiffs provided to Trans Union placed Trans Union on notice that the loans were—at best highly questionable, and at worst a complete sham, and Trans Union should have maintained reasonable procedures to ensure that it did not include any information pertaining to these loans in Plaintiffs' or the class members' reports.

60. The financial institution partners received notice from the Attorneys General who wrote on behalf of their consumers - the putative class - to notify them that these Pink Energy accounts were disputed.

61. Trans Union had long been on notice—through correspondence from multiple State Attorneys General and public enforcement filings—that the Pink Energy loans were unreliable and likely fraudulent. Nevertheless, Trans Union continued to publish and reissue reports containing those same tradelines without undertaking any steps to confirm their accuracy or credibility, as required under §1681e(b).

62. Despite the widely known and publicized statements from numerous Attorneys General and other government authorities, Trans Union continued to report the same inaccurate information from its Pink Energy furnishers, without implementing or adjusting any procedures to ensure the accuracy of these tradelines before republishing them.

63. Any argument that the notice text or information stated within the AG publications or consumer dispute letters about the fraudulent reported "loans" did not contain all of the detail or fraud facts stated herein is disingenuous and immaterial as Trans Union still accepts and continues to report the same accounts from the same customers with no change whatsoever even after other lawsuits against it have notified it of these problems.

64. This conduct violated the FCRA, which required Trans Union to use "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report related." 15 U.S.C. § 1681e(b). Plaintiffs are not alleging that the Defendant was required to know about the content, communications or personal fraud items within each transaction, but rather that it had a duty to investigate to determine whether its customer sources themselves were generally credible, such to be permitted to report data within the highly-regulated credit files and reports at Trans Union. The scams and fraud that occurred with respect to the Plaintiffs and similarly situated consumers was inevitable, foreseeable and

abetted by Trans Union's total failure to vet, audit, research and investigate whether such companies were legitimate.

**D. Plaintiff Steven Bilodeau, Jr.'s Additional Experiences**

65. On and after March 8, 2024, Trans Union allowed GoodLeap to report adverse information about Plaintiff Steven Bilodeau, Jr. ("Mr. Bilodeau" or "Plaintiff Bilodeau").

66. In particular, Trans Union allowed GoodLeap to report that Mr. Bilodeau was seriously past due on a loan serviced by GoodLeap, including a past due amount, with an inaccurately reported principal amount and inaccurate payment amounts.

67. Trans Union allowed GoodLeap's reporting to be added to Mr. Bilodeau's credit files, even though it knew or should have known that the underlying debt was unlawful, inaccurate, and the product of a known lending scam. By the time of the Minnesota Attorney General's March 7, 2024 enforcement action against GoodLeap—which detailed how all "Pink Energy" loans were unlawfully structured and misrepresented borrowers' obligations—Trans Union was on clear notice that the GoodLeap/Pink Energy accounts were unreliable and likely fraudulent. Yet Trans Union continued to include the GoodLeap tradeline in Mr. Bilodeau's credit file as an active, legitimate debt.

68. Mr. Bilodeau disputed the GoodLeap account with Trans Union in April 2024 via Certified Mail requesting that Trans Union delete the GoodLeap account from his credit files.

69. In response to Mr. Bilodeau's dispute, Trans Union either failed to provide any response at all or failed to its own independent investigation. Rather than reviewing the underlying evidence or verifying the accuracy of the GoodLeap account itself, Trans Union simply deferred to and repeated GoodLeap's reporting. Once GoodLeap confirmed the same inaccurate

information it had already been reporting, Trans Union accepted that verification at face value and took no additional steps to ensure that the information was accurate before continuing to report it.

70. Additionally, Trans Union took no steps itself to permanently block credit reporting or delete the disputed tradeline from Mr. Bilodeau's credit files.

71. Furthermore, Trans Union did not take the minimal measure of including a notation or remark that the account was disputed by Mr. Bilodeau.

72. As a result, the inaccurate information regarding the GoodLeap account remained on Mr. Bilodeau's credit files.

73. This account should not have appeared in Mr. Bilodeau's credit reports after Trans Union was placed on notice—through public enforcement actions and widespread media coverage—that GoodLeap's "Pink Energy" loans were fraudulent and misleading.

74. Furthermore, this information should not have appeared in Mr. Bilodeau's credit report after Mr. Bilodeau, who was backed by numerous Attorneys General, disputed the debt.

75. Because of Trans Union's inaccurate reporting, Mr. Bilodeau's credit files falsely suggested that he owed a valid debt to GoodLeap, preventing him from credibly demonstrating to prospective creditors that the account was invalid and the result of a known lending scam. This erroneous tradeline also falsely inflated his total reported debt by more than $80,000, further distorting his debt-to-credit ratio and credit profile and damaging his perceived creditworthiness.

76. Mr. Bilodeau experienced significant stress, credit and reputational harm as a result.

### E. Plaintiff Susan Hudspeth's Experience

77. On and after March 8, 2024, Trans Union allowed GoodLeap to report adverse information about Plaintiff Susan Hudspeth ("Ms. Hudspeth" or "Plaintiff Hudspeth").

78. In particular, Trans Union allowed GoodLeap to report that Ms. Hudspeth owed on a solar loan account opened in April 2020 with an original balance with an inaccurately reported principal amount and inaccurate payment amounts., despite multiple issues concerning the validity of the obligation and inaccurate interest charges tied to her solar installation agreement.

79. Trans Union allowed GoodLeap's reporting to be added to Ms. Hudspeth's credit files, even though it knew or should have known that the underlying debt was unlawful, inaccurate, and the product of a known lending scam. By the time of the Minnesota Attorney General's March 7, 2024 enforcement action against GoodLeap—which detailed how all "Pink Energy" loans were unlawfully structured and misrepresented borrowers' obligations—Trans Union was on clear notice that the GoodLeap/Pink Energy accounts were unreliable and likely fraudulent. Yet Trans Union continued to include the GoodLeap tradeline in Ms. Hudspeth's credit file as an active, legitimate debt.

80. Ms. Hudspeth disputed the GoodLeap account with Trans Union in May 2025 via Certified Mail requesting that Trans Union delete the GoodLeap account from her credit files.

81. In response to Ms. Hudspeth's dispute, Trans Union failed to its own independent investigation. Rather than reviewing the underlying evidence or verifying the accuracy of the GoodLeap account itself, Trans Union simply deferred to and repeated GoodLeap's reporting. Once GoodLeap confirmed the same inaccurate information it had already been reporting, Trans Union accepted that verification at face value and took no additional steps to ensure that the information was accurate before continuing to report it.

82. Additionally, Trans Union took no steps itself to permanently block credit reporting or delete the disputed tradeline from Ms. Hudspeth's credit files.

83. Furthermore, Trans Union did not take the minimal measure of including a notation or remark that the account was disputed by Ms. Hudspeth.

84. As a result, the inaccurate information regarding the GoodLeap account remained on Ms. Hudspeth's credit files.

85. This account should not have appeared in Ms. Hudspeth's credit reports after Trans Union was placed on notice—through public enforcement actions and widespread media coverage—that GoodLeap's "Pink Energy" loans were fraudulent and misleading.

86. Because of Trans Union's inaccurate reporting, Ms. Hudspeth's credit files falsely suggested that she owed a valid debt to GoodLeap, preventing her from credibly demonstrating to prospective creditors that the account was invalid and the result of a known lending scam. This erroneous tradeline also falsely inflated his total reported debt by more than $43,000, further distorting her debt-to-credit ratio and credit profile and damaging her perceived creditworthiness.

87. Ms. Hudspeth experienced significant stress, credit and reputational harm as a result.

**F. Plaintiff Brian Mitchell's Additional Experiences**

88. On and after March 8, 2024, Trans Union allowed GoodLeap to report adverse information about Plaintiff Brian Mitchell ("Mr. Mitchell" or "Plaintiff Mitchell").

89. In particular, Trans Union allowed GoodLeap to report that Mr. Mitchell owed on a loan opened in August 2020 with an original balance of $45,710, with an inaccurately reported principal amount and inaccurate payment amounts.

90. Trans Union allowed GoodLeap's reporting to be added to Mr. Mitchell's credit files, even though it knew or should have known that the underlying debt was unlawful, inaccurate, and the product of a known lending scam. By the time of the Minnesota Attorney General's March

7, 2024 enforcement action against GoodLeap—which detailed how all "Pink Energy" loans were unlawfully structured and misrepresented borrowers' obligations—Trans Union was on clear notice that the GoodLeap/Pink Energy accounts were unreliable and likely fraudulent. Yet Trans Union continued to include the GoodLeap tradeline in Mr. Mitchell's credit file as an active, legitimate debt. Additionally, Trans Union took no steps itself to permanently block credit reporting or delete the disputed tradeline from Mr. Mitchell's credit files.

91. Mr. Mitchell disputed the GoodLeap account with Trans Union in July 2025 via Certified Mail requesting that Trans Union delete the GoodLeap account from his credit files.

92. In response to Mr. Mitchell's dispute, Trans Union failed to its own independent investigation. Rather than reviewing the underlying evidence or verifying the accuracy of the GoodLeap account itself, Trans Union simply deferred to and repeated GoodLeap's reporting. Once GoodLeap confirmed the same inaccurate information it had already been reporting, Trans Union accepted that verification at face value and took no additional steps to ensure that the information was accurate before continuing to report it.

93. Additionally, Trans Union took no steps itself to permanently block credit reporting or delete the disputed tradeline from Mr. Mitchell's credit files.

94. Furthermore, Trans Union did not take the minimal measure of including a notation or remark that the account was disputed by Mr. Mitchell.

95. As a result, the inaccurate information regarding the GoodLeap account remained on Mr. Mitchell's credit files.

96. This account should not have appeared in Mr. Mitchell's credit reports after Trans Union was placed on notice—through public enforcement actions and widespread media coverage—that GoodLeap's "Pink Energy" loans were fraudulent and misleading.

97. Because of Trans Union's inaccurate reporting, Mr. Mitchell's credit files falsely suggested that he owed a valid debt to GoodLeap, preventing him from credibly demonstrating to prospective creditors that the account was invalid and the result of a known lending scam. This erroneous tradeline also falsely inflated his total reported debt by more than $40,000, further distorting his debt-to-credit ratio and credit profile and damaging his perceived creditworthiness.

98. Mr. Mitchell experienced significant stress, credit and reputational harm as a result.

**G. Plaintiff Raymond Smith's Additional Experiences**

99. On and after March 8, 2024, Trans Union allowed GoodLeap to report adverse information about Plaintiff Raymond Smith ("Mr. Smith" or "Plaintiff Smith").

100. In particular, Trans Union allowed GoodLeap to report that Mr. Smith owed on a solar loan account opened October 14, 2020 with an original balance with an inaccurately reported principal amount and inaccurate payment amounts., and that the account was past due, despite multiple issues concerning the validity of the obligation and inaccurate interest charges tied to his solar installation agreement.

101. Trans Union allowed GoodLeap's reporting to be added to Mr. Smith's credit files, even though it knew or should have known that the underlying debt was unlawful, inaccurate, and the product of a known lending scam. By the time of the Minnesota Attorney General's March 7, 2024 enforcement action against GoodLeap—which detailed how all "Pink Energy" loans were unlawfully structured and misrepresented borrowers' obligations—Trans Union was on clear notice that the GoodLeap/Pink Energy accounts were unreliable and likely fraudulent. Yet Trans Union continued to include the GoodLeap tradeline in Mr. Smith's credit file as an active, legitimate debt.

102. Mr. Smith disputed the GoodLeap account with Trans Union in May 2025 via Certified Mail requesting that Trans Union delete the GoodLeap account from his credit files.

103. In response to Mr. Smith's dispute, Trans Union failed to its own independent investigation. Rather than reviewing the underlying evidence or verifying the accuracy of the GoodLeap account itself, Trans Union simply deferred to and repeated GoodLeap's reporting. Once GoodLeap confirmed the same inaccurate information it had already been reporting, Trans Union accepted that verification at face value and took no additional steps to ensure that the information was accurate before continuing to report it.

104. Additionally, Trans Union took no steps itself to permanently block credit reporting or delete the disputed tradeline from Mr. Smith's credit files.

105. Furthermore, Trans Union did not take the minimal measure of including a notation or remark that the account was disputed by Mr. Smith.

106. As a result, the inaccurate information regarding the GoodLeap account remained on Mr. Smith's credit files.

107. This account should not have appeared in Mr. Smith's credit reports after Trans Union was placed on notice—through public enforcement actions and widespread media coverage—that GoodLeap's "Pink Energy" loans were fraudulent and misleading.

108. Because of Trans Union's inaccurate reporting, Mr. Smith's credit files falsely suggested that he owed a valid debt to GoodLeap, preventing him from credibly demonstrating to prospective creditors that the account was invalid and the result of a known lending scam. This erroneous tradeline also falsely inflated his total reported debt by more than $50,000, further distorting his debt-to-credit ratio and credit profile and damaging his perceived creditworthiness.

109. Mr. Smith experienced significant stress, credit and reputational harm as a result.

**G. Plaintiff Wilton Wahlkamp's Additional Experiences**

110. On and after March 8, 2024, Trans Union allowed GoodLeap to report adverse information about Plaintiff Wilton Wahlkamp ("Mr. Wahlkamp" or "Plaintiff Wahlkamp").

111. In particular, Trans Union allowed GoodLeap to report that Mr. Wahlkamp owed on a loan opened September 8, 2020 with an original balance of $39,968, later showing a balance of $25,930, and reported as past due with an inaccurately reported principal amount and inaccurate payment amounts.

112. Trans Union allowed GoodLeap's reporting to be added to Mr. Wahlkamp's credit files, even though it knew or should have known that the underlying debt was unlawful, inaccurate, and the product of a known lending scam. By the time of the Minnesota Attorney General's March 7, 2024 enforcement action against GoodLeap—which detailed how all "Pink Energy" loans were unlawfully structured and misrepresented borrowers' obligations—Trans Union was on clear notice that the GoodLeap/Pink Energy accounts were unreliable and likely fraudulent. Yet Trans Union continued to include the GoodLeap tradeline in Mr. Wahlkamp's credit file as an active, legitimate debt.

113. Mr. Wahlkamp disputed the GoodLeap account with Trans Union in May 2025 via Certified Mail requesting that Trans Union delete the GoodLeap account from his credit files.

114. In response to Mr. Wahlkamp's dispute, Trans Union failed to its own independent investigation. Rather than reviewing the underlying evidence or verifying the accuracy of the GoodLeap account itself, Trans Union simply deferred to and repeated GoodLeap's reporting. Once GoodLeap confirmed the same inaccurate information it had already been reporting, Trans Union accepted that verification at face value and took no additional steps to ensure that the information was accurate before continuing to report it.

115. Additionally, Trans Union took no steps itself to permanently block credit reporting or delete the disputed tradeline from Mr. Wahlkamp's credit files.

116. Furthermore, Trans Union did not take the minimal measure of including a notation or remark that the account was disputed by Mr. Wahlkamp.

117. As a result, the inaccurate information regarding the GoodLeap account remained on Mr. Wahlkamp's credit files.

118. This account should not have appeared in Mr. Wahlkamp's credit reports after Trans Union was placed on notice—through public enforcement actions and widespread media coverage—that GoodLeap's "Pink Energy" loans were fraudulent and misleading.

119. Because of Trans Union's inaccurate reporting, Mr. Wahlkamp's credit files falsely suggested that he owed a valid debt to GoodLeap, preventing him from credibly demonstrating to prospective creditors that the account was invalid and the result of a known lending scam. This erroneous tradeline also falsely inflated his total reported debt by more than $25,000, further distorting his debt-to-credit ratio and credit profile and damaging his perceived creditworthiness.

120. Mr. Wahlkamp experienced significant stress, credit and reputational harm as a result.

**H. Trans Union's Violations Were Willful.**

121. Trans Union's reporting of the Pink Energy Partner accounts and processing of consumer disputes was willful and carried out in reckless disregard for the consumers' rights under the FCRA. Trans Union's conduct was willful because it was accomplished through intended procedures that prioritize its own profitability over accuracy.

122. TransUnion had already been sued on the same issues before this Court prior to any of the violatiosn alleged herein.

123. TransUnion had actual knowledge that the loans and Pink Energy partners were not reliable based on that litigation, as well as all of the collateral matters alleged above.

124. TransUnion has not done anything since obtaining such actual knowledge to investigate and research the issues alleged.

125. Neither TransUnion nor its lawyers have had business-to-business meetings, calls or e-mail exchanges with any of the Pink Energy partners about the issues alleged herein since the filing of the other pending action against TransUnion.

126. In addition, the willful nature of Trans Union's FCRA violations can be established by, for example:

a. The FCRA was enacted in 1970; Trans Union has had 53 years to become compliant;

b. Trans Union is a large company with access to legal advice through its own general counsel's office and/or outside litigation counsel. Yet, there is no contemporaneous evidence that it determined that its conduct was lawful;

c. Trans Union knew or had reason to know that its conduct was inconsistent with numerous Attorneys General's guidance, case law, and the plain language of the FCRA;

d. Trans Union voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless; and

e. Trans Union's violations of the FCRA were repeated and systemic.

## CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF THE FCRA, 15 U.S.C. § 1681e(b)
### (Class Claim)

127. Plaintiffs incorporate by reference each of the allegations set forth in the preceding paragraphs.

128. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as:

> **Post-Minnesota AG 1681e(b) Class:** All persons residing in the United States (1) for whom Trans Union furnished a consumer report; (2) after March 8, 2024; and (3) containing an account where the loan was arranged by one of the Pink Energy Partners; and (4) the account pertains to a consumer's purchase of products and/or equipment from Pink Energy.
>
> Excluded from the sub-class definition are any employees, officers, directors of Defendant, any attorney appearing in this case, any person employed by the Federal Judiciary, and all persons who have signed a written release of his or her claim.

129. Plaintiffs are all members of this Class. (The "Class" and the "Class members").

130. Numerosity. Fed. R. Civ. P. 23(a)(1). Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all their claims is impractical. The class members' names and addresses are identifiable through Trans Union's internal business records, and they may be notified of the pendency of this action by published and/or mailed notice.

131. Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include (1) whether Trans Union's conduct violated § 1681e(b) by reporting information related to Pink Energy Partners' accounts after Trans Union's receipt of consumer disputes backed by numerous State Attorneys General; (2) whether Trans Union maintained reasonable procedures designed to avoid violations of § 1681e(b); (3) inaccuracy; (4) whether Trans Union's conduct was

willful or negligent violation; and (5) the appropriate measure of the amount of damages to be awarded to each consumer.

132. Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members' claims.

133. Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiffs have retained counsel competent and experienced in such litigation and intends, with their counsel, to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the class members' interests. Neither Plaintiffs nor their counsel have any interest that might conflict with their vigorous pursuit of this action.

134. Superiority. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Trans Union's conduct. By contrast, the class-action device will result in substantial benefits to

the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

135. As described above, Trans Union violated § 1681e(b) of the FCRA by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiffs.

136. On one or more occasions after March 7, 2024, TransUnion furnished a consumer report about each Plaintiff and each Class member that contained the inaccurate Pink Energy partner tradeline alleged herein.

137. Plaintiffs and each putative class member suffered real and actual harm and injury.

138. For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Trans Union's files and reports.

139. In each instance, each class member's credit report contained derogatory information that Trans Union was legally obligated to remove or permanently block the reporting thereof.

140. Trans Union's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Trans Union liable under 15 U.S.C. § 1681o.

141. As a result of these FCRA violations, Trans Union is liable for statutory damages from $100.00 to $1,000.00 for Plaintiffs and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

**COUNT TWO:
VIOLATION OF THE FCRA, 15 U.S.C. § 1681i(a)
(Individual Claims)**

142. Plaintiffs each made disputes to Trans Union after March 8, 2024 and preceding the filing of this action about the inaccurate reporting of GoodLeap accounts.

143. In each instance, Trans Union refused to conduct any meaningful or reasonable investigation and instead relied entirely on its parroting of its paying customers, the Pink Energy Partners, to include GoodLeap.

144. Trans Union violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate.

145. Trans Union violated 15 U.S.C. § 1681i(a)(4) by its conduct which includes, but is not limited to, failing to review and consider all relevant information that it received with the Plaintiffs' disputes.

146. Further, not only did Trans Union not permanently block or delete the disputed GoodLeap tradelines with regard to Plaintiffs, but it also intentionally refused to note the accounts reporting as in dispute.

147. Trans Union thus violated 15 U.S.C. § 1681i(a)(5) by its conduct which includes, but is not limited to, failing to delete or modify any information that was the subject of the Plaintiffs' disputes and that was inaccurate or could not be verified.

148. The Plaintiffs have been prevented and deterred from securing credit that they should have otherwise qualified for due to the inaccurate information that Trans Union has continued to include within their files, directly and as well without reporting it as disputed.

149. As a result of Trans Union's conduct, actions, and inaction, the Plaintiffs suffered damages to include, but not limited to damage to their credit rating, increased costs and interest,

aggravation, emotional stress, inconvenience, embarrassment, and frustration.

150. As a result of Trans Union's conduct, actions, and inaction, the Plaintiffs suffered actual damages.

151. Trans Union's violations were willful, pursuant to 15 U.S.C. § 1681n, or, in the alternative, negligent entitling the Plaintiffs to recover under 15 U.S.C. § 1681o.

152. As a result of Trans Union's violation of 15 U.S.C § 1681i(a), the Plaintiffs are entitled to recover actual, statutory, and punitive damages, in addition to their costs and attorney fees.

**WHEREFORE**, the Plaintiffs request certification of the class pursuant to Fed. R. Civ. P. 23(b); demands judgment on liability finding that Defendant willfully, or in the alternative negligently, violated 15 U.S.C. §§ 1681e(b) and 1681i(a); demands judgment for actual, statutory and punitive damages against the Defendant, for attorneys' fees and costs, for prejudgment and postjudgment at the legal rate, and such other relief the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

Respectfully Submitted,
**STEVEN BILODEAU, JR.,**
**SUSAN HUDSPETH,**
**BRIAN MITCHELL,**
**RAYMOND SMITH, and**
**WILTON WAHLKAMP,**

By: *\/s/ Leonard A. Bennett*

Leonard A. Bennett, VSB #37523
Thomas Domonoske, VSB #35434
Mark C. Leffler, VSB #40712
Adam W. Short, VSB #98844
John Maravalli, VSB #99000
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A

Newport News, Virginia 23601
Telephone: (757) 930-3660
Fax: (757) 930-3662
Email: tom@clalegal.com
Email: lenbennett@clalegal.com
Email: adam@clalegal.com
Email: john@clalegal.com

Kristi C. Kelly, VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiffs*